UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NOVELPOSTER,<br><br>                    Plaintiff,<br><br>          v.<br><br>JAVITCH CANFIELD GROUP, et al.,<br><br>                    Defendants. | Case No. 13-cv-05186-WHO<br><br>**ORDER GRANTING MOTION TO DISMISS FIRST AMENDED COUNTERCLAIM AND THIRD-PARTY COMPLAINT**<br><br>Re:  Dkt. No. 65 |

**INTRODUCTION**

In this action involving a failed business relationship, defendants and third-party plaintiffs Javitch Canfield Group, Mark Javitch, and Daniel Canfield (collectively, "TPPs") filed a First Amended Counterclaim against plaintiff NovelPoster and a Third-Party Complaint against third-party defendants Matt Grinberg and Alex Yancher, the co-owners of NovelPoster.  Instead of cross-complaining for breach of contract, which the allegations in the First Amended Counterclaim and Third-Party Complaint ("FACTPC") would appear to support, the TPPs offer nine other causes of action to escalate litigation which is already well out of proportion to the apparent actual damages alleged thus far.  NovelPoster, Grinberg, and Yancher (collectively, "TPDs"[1]) move to dismiss the FACTPC in its entirety for failure to state a claim for any of the nine causes of action and because they argue that impleading Grinberg and Yancher was improper.

Grinberg and Yancher could potentially be properly joined into this action under Federal Rule of Civil Procedure 20, but because the TPPs fail to adequately plead facts supporting any of their asserted causes of action, the motion to dismiss is GRANTED with leave to amend.

---

[1] Although NovelPoster is not technically a third-party defendant, this Order will include it under the "TPD" designation for simplicity.

United States District Court<br>Northern District of California

United States District Court
Northern District of California

**FACTUAL BACKGROUND**

The FACTPC alleges the following:

NovelPoster is a company that sells posters containing an entire novel's text.  FACTPC ¶ 15.

Javitch is the founder of The Javitch Group LLC,[2] for which Canfield is an independent contractor.  FACTPC ¶ 7.

On March 18, 2013, Yancher and Canfield met at a social event, where Yancher attempted to solicit Canfield to do business with him.  FACTPC ¶ 16.  Yancher claimed that he earned $10,000 per month from NovelPoster and was selling it for $150,000.  FACTPC ¶¶ 17-19.

On March 31, 2013, Yancher emailed Canfield a link to a listing by NovelPoster's business broker, which showed that NovelPoster's asking price was $125,000 and that the owners wished to "Pursue Other Business Interests."  FACTPC ¶ 21, Ex. B.  The listing also stated that, in 2012, NovelPoster sold 2,200 posters, had sales totaling $85,000, had inventory worth $5,000, and had a cash-flow and EBITDA of $36,500; it also said that sales were divided equally between repeat wholesale buyers and online purchasers who paid full retail price.  FACTPC ¶¶ 22, 98, Ex. B.  The listing also claimed that NovelPoster expected "2,600-unit sales of $120,000 in 2013."  FACTPC ¶ 98, Ex. B.

Canfield initially declined to purchase NovelPoster, but Yancher persisted in soliciting him.  FACTPC ¶¶ 23-24.  On April 4, 2013, Yancher emailed Canfield, stating that his other business "is taking up 110% of [his] time" and Canfield "ha[s] the consumer marketing experience to make NovelPoster big."  FACTPC ¶ 25, Ex. C.  Yancher continued, "[NovelPoster's] actively on sale right now for $150K and we've had interest but obviously haven't close [sic] yet.  Would you be interested in some arrangement in which we hand over the reigns [sic] to you and you can pay us some monthly earnout over the next couple of years with some light upfront payment?"  FACTPC ¶ 26, Ex. C.

---

[2] Although the original complaint in this action names Javitch Canfield Group as a defendant, the defendants and TPPs claim that no such entity exists and that The Javitch Group LLC is the true entity.

2

The next day, Canfield responded and expressed some interest, asking Yancher for profit-and-loss statements and employee costs.  FACTPC ¶ 27, Ex. C.  Yancher responded by making various claims, including that NovelPoster's operating margins are 60 percent, that it was the category "market leader," and that in "2012 we filed taxes for $84K in revenue but we really made closer to 90K ($6k was from events, etc)."  FACTPC ¶¶ 28, 98, Ex. D.  He also said that the "[o]nly other costs are the storage facility ($180/month) and my friend who works the warehouse (I pay him $15/hour)."  FACTPC ¶ 29, Ex. D.

On April 14, 2013, Yancher told Canfield over the phone that he had some offers to buy NovelPoster for $100,000, but if none of those offers succeeded, he would be willing to form a revenue-sharing agreement for a small upfront fee.  FACTPC ¶ 30.  On April 23, 2013, Yancher proposed certain terms to Canfield, including:  "Javitch Canfield takes over all aspects of NovelPoster operations except for poster design"; "NovelPoster takes 20% of sales as a licensing fee"; "Javitch Canfield agrees to spend a minimum of $30K on marketing"; and the deal would be "good for [1] year," with a "break-up fee of $10K if either party terminates before."  FACTPC ¶ 31, Ex. E (original brackets).  Yancher predicted that if $30,000 was spent on advertising, NovelPoster would have about $150,000 in revenue and Canfield would make $45,000.  FACTPC ¶ 32, Ex. E.

On April 28, 2013, Yancher emailed Canfield and Grinberg, stating that he and Grinberg were excited about the prospective relationship and that he would draft the terms to be circulated before a meeting.  FACTPC ¶ 33, Ex. F.  Yancher also proposed including a non-compete clause. FACTPC ¶ 33, Ex. F.  Two days later, Yancher emailed the terms to Canfield, Javitch, and Grinberg, stating that "[t]here's obviously not enough money here at stake to justify getting lawyers involved."  FACTPC ¶ 34, Exs. G, H.  The terms included:

- "Javitch Canfield takes over all aspects of NovelPoster operations except for poster design."
- "NovelPoster takes 20% of sales"
- "NovelPoster continues to be responsible for additional poster design at a rate of [one new poster per month]"

3

- "Javitch Canfield receive [sic] 10% equity in NovelPoster, which would vest over 2-years" FACTPC ¶ 35, Ex. H (original brackets).

On May 1, 2013, Yancher, Grinberg, Canfield, and Javitch met in person, during which Javitch and Canfield discussed their ideas to build a new e-commerce website for NovelPoster, to sell the products through Amazon.com, and to lower costs by using a fulfillment center in Florence, Kentucky.  FACTPC ¶ 36.

The next day, Canfield emailed the group, stating, "Great sitting down with you two last night.  We would like to get started working on the website.  Is the domain through Godaddy?  If yes, we can send you the directions to initiate the transfer over to our account so we can get our programmers on it."  FACTPC ¶ 37, Ex. I.  Javitch later emailed the group, stating, "Here are the instructions for an Account Change since we are both at Godaddy.  Let me know if you have any questions, thanks."  FACTPC ¶ 38, Ex. J.  Javitch sent a link to an article from Godaddy that explained how to "move a domain name from account with us to another"—a process called an "Account Change."  FACTPC ¶ 39, Ex. K.

On May 3, 2013, Grinberg told the group that he completed the account change and Javitch and Canfield "should be in the drivers [sic] seat of the website now."  FACTPC ¶ 40, Exs. J, L. Yancher sent the group an email with the subject "NovelPoster Transition" containing the usernames and passwords to NovelPoster's accounts with third-party websites, such as PayPal, Facebook, and Twitter.  FACTPC ¶ 43, Ex. N.  The email had the username and password to NovelPoster's administrator account with Google Apps for Business, which controls NovelPoster's email.  FACTPC ¶ 44, Ex. N.  It also contained information about how NovelPoster operated, including the names of vendors.  FACTPC ¶ 47, Ex. N.  Additionally, the email described specific information about NovelPoster's wholesale customers.  FACTPC ¶ 98. Yancher stated in the email, "I need to make email intro's [sic] to my contacts."  FACTPC ¶ 48, Ex. N.

On the same day, Yancher sent an email to the group entitled "Terms Agreement Email." FACTPC ¶ 49, Ex. O.  Yancher wrote, "Per our chat on Wednesday (5/1), below is the arrangement we've agreed to.  Let's keep this over emails [sic] so we have a record of it."  The

4

terms included:

- "Javitch Canfield takes over all aspects of NovelPoster operations except for poster design."
- "NovelPoster takes 20% of sales"
- "NovelPoster continues to be responsible for additional poster design at a rate of [one new poster per month]"
- "Javitch Canfield receive [sic] 10% equity in NovelPoster, which would vest over 2-years"
- "Javitch Canfield agrees not to compete with NovelPoster by creating their own text-based poster similar to NovelPoster"

FACTPC ¶ 49, Ex. O (original brackets).

On May 7, 2013,[3] Canfield emailed Yancher, stating, "We haven't had a chance to look over all the NovrlPoster [sic] materials and numbers, but it looks good so far."  FACTPC ¶ 50, Ex. P.  The next day, Yancher responds, "Not sure what you'll find in the NP materials / numbers that could alter our arrangement sine [sic] we only get paid as a % of sales and since you're not buying the business.  So I'll take 'it looks good so far' in good faith that everything should proceed according to plan."  FACTPC ¶ 51, Ex. P.

Later on May 8th, Grinberg emailed Canfield and Javitch, copying Yancher, "I just noticed you changed some [of] the passwords we gave you to Paypal, Stripe, etc.  This is totally fine for now, but we'll need access to all of our accounts as we move forward.  It will be helpful to you and keep the process transparent between us."  FACTPC ¶ 52, Ex. Q.  Grinberg also included an altered version of the parties' terms and agreement, and asked that Canfield and Javitch "clearly confirm" that they "read, understood, and agree" to the terms of the arrangement; Grinberg did not identify any of the changes.  FACTPC ¶¶ 53-54, Ex. Q.  The only substantive alteration states that "NovelPoster continues to have ownership of all NovelPoster related accounts."  *See* FACTPC Ex. Q.  On May 9, 2013,[4] Canfield responds, "[W]e agree to the email and to re-evaluate in 6 months to discuss new terms going."  FACTPC ¶ 55, Ex. R.

---

[3] The FACTPC incorrectly identifies the date as May 8, 2013.
[4] The FACTPC incorrectly identifies the date as May 8, 2013.

United States District Court
Northern District of California

1          On May 13, 2013, The Javitch Group hired movers to transport NovelPoster's poster

2 inventory from Daly City, California, to Florence, Kentucky.  FACTPC ¶ 56.  That same day,

3 Canfield wrote to the group, "We will be switching out of Goodsie soon to our own proprietary

4 system that manages orders and payments, so we will not be able to provide admin access to that,

5 but will of course give you reports and be very transparent. . . . If we get any email

6 correspondence for you, we will definitely pass it along to you both as well."  FACTPC ¶¶ 57-58,

7 Ex. S.

8          On May 21, 2013, in response to Canfield's request that Yancher and Grinberg make

9 introductions to any connections they have, Yancher agreed to do so "in the upcoming days."

10 FACTPC ¶ 59, Ex. T.

11          On June 5, 2013, Javitch and Canfield learned that Yancher had issued an invoice on

12 behalf of NovelPoster to a customer despite the fact that NovelPoster transferred all operations to

13 Javitch Canfield.  FACTPC ¶¶ 60-61, Ex. U.  The invoice Yancher sent was in response to a

14 request from the customer to Yancher that he forward an invoice for a transaction that occurred in

15 April 2013, i.e., prior to the parties' agreement.  FACTPC Ex. U.

16          On June 6, 2013, Javitch expressed concern to the group that sales for the month were

17 under $2,000, so he requested information from Yancher to explain the discrepancies between the

18 most recent sales and Yancher and Grinberg's representation that NovelPoster's 2012 revenue was

19 approximately $90,000.  FACTPC ¶ 62, Ex. V.  Yancher responded that the information Javitch

20 requested was not "readily available" because Yancher would need to "go back and check all the

21 deposits individually," which would be "really time consuming and probably not even that

22 helpful."  FACTPC ¶ 63, Ex. V.  Yancher also said that NovelPoster paid $3,550 for advertising

23 on Google Adwords in 2012 even though he had previously stated that the only costs besides

24 printing the posters were for a storage facility and a friend who worked at the warehouse.

25 FACTPC ¶ 65, Exs. D, V.  However, Yancher added, "I mentioned this to you and Dan during our

26 meeting."  FACTPC Ex. V.  The TPPs state, "Upon information and belief, there are other costs

27 incurred by Novelposter that Yancher and Grinberg failed to disclose to Javitch and Canfield."

28 FACTPC ¶ 66.  As of the filing of the FACTPC, NovelPoster has failed to document its 2012 or

1    2013 sales other than exporting printouts of website sales from 2012 showing approximately

2    $38,000 in sales.  FACTPC ¶ 64.

3         On June 6, 2013, The Javitch Group changed the settings on Godaddy to cause the

4    www.novelposter.com email and website traffic to be delivered to the hosting account maintained

5    by The Javitch Group.  FACTPC ¶ 67.  The change caused the email that was previously delivered

6    to NovelPoster's Google Apps for Business account to be delivered to the servers maintained by

7    The Javitch Group; it also rerouted website traffic previously delivered to NovelPoster's Goodsie

8    account to be delivered to The Javitch Group's servers.  FACTPC ¶¶ 68, 69.  "For security

9    reasons, The Javitch Group [ ] changed the passwords to all of the Novelposter accounts on third

10   party sites."  FACTPC ¶ 70.  Grinberg and Yancher protested not having access to The Javitch

11   Group's servers and NovelPoster's accounts with third-party websites.  FACTPC ¶ 71.  On June

12   13, 2013, Yancher, Grinberg, Javitch, and Canfield met to discuss the dispute.  FACTPC ¶ 72.

13        On June 14, 2013, Grinberg attempted to terminate the parties' agreement by email, stating

14   that he and Yancher believed that Javitch and Canfield "materially breached" the agreement.

15   FACTPC ¶ 73, Ex. W.  Grinberg and Yancher demanded that Javitch and Canfield do the

16   following:  (i) "Email all NovelPoster-related account access credentials" to them; (ii) transfer

17   back the www.novelposter.com domain; (iii) cease all communications with customers; (iv)

18   provide a sales report of all transactions Javitch and Canfield handled; (v) begin returning

19   inventory; and (vi) take down Javitch Canfield's NovelPoster website and remove all mentions of

20   NovelPoster from Javitch Canfield's own website.  FACTPC Ex. W.

21        Later that day, Javitch responded to the email and rejected the termination as improper; he

22   also "warned" Grinberg and Yancher not to interfere with NovelPoster.  FACTPC ¶ 75, Ex. X.

23   Javitch pointed out that the historical sales figures presented during the parties' negotiations were

24   lower, and the advertising expenditures are higher, than expected.  FACTPC ¶ 76, Ex. X.  Javitch

25   said that The Javitch Group would continue to operate NovelPoster to mitigate their damages.

26   FACTPC ¶ 77, Ex. X.  As of the filing of the FACTPC, Grinberg and Yancher have failed to

27   provide any financial information.  FACTPC ¶ 78.  Nonetheless, the Javitch Group continued to

28   operate NovelPoster and made monthly royalty payments to Yancher between May and August

United States District Court
Northern District of California

7

2013.  FACTPC ¶ 79, Ex. Y.

At some point, NovelPoster retained counsel and, on August 30, 2013, counsel sent a letter to Javitch and Canfield making various demands, including that they "[r]eimburse [NovelPoster] $4,000 for the attorneys' fees it has expended thus far, in recognition that any lawsuit that could come about in this matter allows for [more] attorneys' fees."  FACTPC ¶ 80, Ex. Z.  On September 19, 2013, NovelPoster's counsel and Javitch spoke over the phone and discussed their respective claims.  FACTPC ¶ 81.  That same day, Javitch asked counsel whether NovelPoster's owners would be interested in drafting a proposed resolution.  FACTPC ¶ 82, Ex. AA.  On October 7, 2013, Javitch suggested that he and counsel "work out the terms of the trust agreement" so that royalty payments can be placed in a trust account; counsel did not respond.  FACTPC ¶¶ 83-84, Ex. BB.  Nonetheless, Javitch deposited royalty payments into a separate escrow account for September 2013 through January 2014.  FACTPC ¶ 85, Ex. Y.  The total amount of sales when The Javitch Group, Javitch, and Canfield were operating NovelPoster was $23,416.85.  FACTPC ¶ 86.

On December 2, 2013, The Javitch Group removed NovelPoster's logo from its website.  FACTPC ¶ 87.  On December 4, 2013, The Javitch Group shut down its own NovelPoster website.  FACTPC ¶ 88.  On December 16, 2013, The Javitch Group made NovelPoster's remaining inventory of posters available for pickup at its Kentucky warehouse.  FACTPC ¶ 89.  Instead of picking up the inventory, and without the defendants' knowledge, NovelPoster, Yancher, and Grinberg contacted the third-party warehouse, which was rented by The Javitch Group, to continue to take advantage of the cost savings The Javitch Group had arranged.  FACTPC ¶ 90.

On December 26, 2013, The Javitch Group offered to transfer www.novelposter.com to NovelPoster, Yancher, and Grinberg and to allow them to use the website created by the defendants.  FACTPC ¶ 91.  On January 3, 2014, The Javitch Group transferred www.novelposter.com to Grinberg's Godaddy account; Javitch also created and sent step-by-step instructions on how to change the Godaddy settings to allow Yancher and Grinberg to use their preferred services for email and web traffic.  FACTPC ¶¶ 92-93.  On January 10, 2014, Yancher and Grinberg changed the Godaddy settings so that @novelposter.com emails would be delivered

1    to NovelPoster's Google Apps for Business account instead of The Javitch Group's servers; they

2    also caused all website traffic to be delivered to NovelPoster's Goodsie account instead of The

3    Javitch Group's servers.  FACTPC ¶¶ 94, 96.  Despite this, on the same day, NovelPoster's

4    counsel threatened to file an *ex parte* application for a temporary restraining order to gain access

5    to the website.  FACTPC ¶ 93.

6        The TPPs assert the following causes of action:  (1) conspiracy to commit fraud against

7    NovelPoster, Yancher, and Grinberg; (2) false promise against NovelPoster and Yancher; (3)

8    breach of contract against NovelPoster, Yancher, and Grinberg; (4) quantum meruit against

9    NovelPoster, Yancher, and Grinberg; (5) breach of implied covenant of good faith and fair dealing

10   against NovelPoster, Yancher, and Grinberg; (6) conversion against NovelPoster, Yancher, and

11   Grinberg; (7) violation of the False Advertising Law ("FAL"), CAL. BUS & PROF. CODE § 17500,

12   against NovelPoster, Yancher, and Grinberg; (8) violation of the Unfair Competition Law

13   ("UCL"), CAL. BUS & PROF. CODE § 17200, against NovelPoster, Yancher, and Grinberg; and (9)

14   intentional interference with prospective economic advantage against Yancher and Grinberg.

### PROCEDURAL HISTORY

16       NovelPoster filed this action on November 6, 2013.  Dkt. No. 1.  On April 21, 2014,

17   Javitch and Canfield filed an Answer to the Complaint, as well as a Counterclaim against

18   NovelPoster and a Third-Party Complaint against Yancher and Grinberg.  Dkt. No. 48.  On May

19   12, 2014, NovelPoster, Yancher, and Grinberg filed a motion to dismiss.  Dkt. No. 50.  On May

20   22, 2014, Javitch and Canfield filed the FACTPC, Dkt. No. 55, which was subsequently corrected,

21   Dkt. No. 59.  NovelPoster, Yancher, and Grinberg again move to dismiss.  Dkt. No. 65.  A hearing

22   on the motion was held on August 13, 2014.

### LEGAL STANDARD

24       A motion to dismiss is proper under Federal Rule of Civil Procedure 12(b)(6) where the

25   pleadings fail to state a claim upon which relief can be granted.  FED. R. CIV. P. 12(b)(6).  The

26   court must "accept factual allegations in the complaint as true and construe the pleadings in the

27   light most favorable to the nonmoving party," *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519

28   F.3d 1025, 1031 (9th Cir. 2008), drawing all "reasonable inferences" from those facts in the

nonmoving party's favor, *Knievel v. ESPN*, 393 F.3d 1068, 1080 (9th Cir. 2005).  A complaint

may be dismissed if it does not allege "enough facts to state a claim to relief that is plausible on its

face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility

when the pleaded factual content allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

However, "a complaint [does not] suffice if it tenders naked assertions devoid of further factual

enhancement." *Id.* (quotation marks and brackets omitted).  "Threadbare recitals of the elements

of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

Additionally, fraud claims are subject to a higher standard and must be pleaded with

particularity.  FED. R. CIV. P. 9(b).  This is true of claims state law claims, such as those under the

UCL and FAL, that are grounded in fraud, which must "be accompanied by the who, what, when,

where, and how of the misconduct charged." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097,

1103, 1106 (9th Cir. 2003) (quotation marks omitted).  Such claims "must be specific enough to

give defendants notice of the particular misconduct which is alleged to constitute the fraud

charged so that they can defend against the charge and not just deny that they have done anything

wrong." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (citation omitted).  If a

complaint "alleges a unified fraudulent course of conduct," the claims are grounded in fraud and

the "entire complaint must therefore be pleaded with particularity." *Kearns v. Ford Motor Co.*,

567 F.3d 1120, 1127 (9th Cir. 2009).  A plaintiff claiming fraud must also plead reliance and the

challenged statements must be judged against the "reasonable consumer" standard. *See Consumer

Advocates v. Echostar Satellite Corp.*, 8 Cal. Rptr. 3d. 22, 29 (Ct. App. 2003).

If a motion to dismiss is granted, a court should normally grant leave to amend unless it

determines that the pleading could not possibly be cured by allegations of other facts. *Cook,

Perkiss & Liehe v. N. Cal. Collection Serv.*, 911 F.2d 242, 247 (9th Cir. 1990).

## DISCUSSION

## I.    IMPLEADER

Under Federal Rule of Civil Procedure 14(a)(1), "A defending party may, as third-party

plaintiff, serve a summons and complaint on a nonparty who is or may be liable to it for all or part

10

of the claim against it." FED. R. CIV. P. 14(a)(1).  "Thus, a third-party claim may be asserted only when the third party's liability is in some way dependent on the outcome of the main claim and is secondary or derivative thereto." *Stewart v. Am. Int'l Oil & Gas Co.*, 845 F.2d 196, 199 (9th Cir. 1988).  "It is not sufficient that the third-party claim is a related claim; the claim must be derivatively based on the original plaintiff's claim." *United States v. One 1977 Mercedes Benz, 450 SEL, VIN 11603302064538*, 708 F.2d 444, 452 (9th Cir. 1983).  "The crucial characteristic of a Rule 14 claim is that defendant is attempting to transfer to the third-party defendant the liability asserted against him by the original plaintiff." *Stewart*, 845 F.2d at 200 (citation omitted); 6 FED. PRAC. & PROC. § 1446 (3d ed.).

The TPDs argue that while Yancher and Grinberg are not parties to the action in their personal capacity, they make up the partnership that forms NovelPoster "and in that sense, they are already participating in the litigation as Plaintiff's agents and thus are existing parties."  Mot. 5.  Already, Yancher and Grinberg must respond to the discovery directed at NovelPoster and they are the persons most knowledgeable about the company.  Mot. 6.  If they are to remain TPDs, they may be liable for any judgment of harm to their own company.  Mot. 6-7.  The TPDs state, "If TPPs win their claims in the Third Party Complaint, Plaintiff's owners will be held liable for the harm that Defendants/TPPs caused to their own company!  The result is absurd."  Mot. 6-7.

The TPDs contend that the claims in the Third-Party Complaint are not dependent upon NovelPoster's claims in the underlying matter.  Mot. 7; Reply 3.  They reason that "[t]he claims in the Third Party Complaint could be brought against TPDs in the absence of Plaintiff's claims and are therefore not dependent upon Plaintiff's claims."  Mot. 7.  They point out that the TPPs' allegation that the "[Third Party Defendants] are nonparties that may be liable for all or part of Plaintiff's claim against Defendants and [Third Party Plaintiffs]" is a naked and unexplained assertion.  Mot. 7 (quoting FACTPC ¶ 12).  The TPDs note that the TPPs do not allege that the damages they claim in the FACTPC—such as the alleged misrepresentations by the TPDs—arise because of losses they will sustain as a result of NovelPoster's claims against them.  Mot. 8.  NovelPoster and the TPDs therefore argue that "the claims against TPDs are really just claims against [NovelPoster] and are therefore counterclaims"—all but one of which are already asserted

11

1    as counterclaims against NovelPoster.  Mot. 5, 7-8; Reply 3.

2          The TPDs argue that even if the Third-Party Complaint's claims do arise from

3    NovelPoster's claims, the TPPs still have not alleged a legal relationship exists with NovelPoster

4    or the TPDs that would provide derivative liability allowing for an interpleader claim.  Mot. 8-9.

5    They claim that there are only "four primary relationships that give rise to an assertion of

6    derivative liability against a third party defendant:  impleader, subrogation, warranty, and

7    contribution."  Mot. 9.  None of these, however, are alleged to exist between NovelPoster and the

8    TPDs.  Mot. 9-10; Reply 3.

9          The TPPs argue that because the crux of NovelPoster's claims against them is that they are

10   liable for continuing to operate NovelPoster after Grinberg attempted to terminate the parties'

11   agreement, and because it was Yancher and Grinberg that "lured them into an agreement to

12   operate" NovelPoster, the TPDs are "liable for some or all of that claim."  Opp'n 11-13.

13   Furthermore, at least Yancher acted in his individual capacity:  for example, Yancher solicited the

14   TPPs through his alex@pantrylabs.com email account, not his NovelPoster email account.  Opp'n

15   13 (citing FACTPC Ex. E).  The TPPs speculate that NovelPoster looked to Wikipedia to argue

16   that Rule 14 requires pleading the existence of an indemnity, subrogation, contribution, or

17   warranty relationship in order to implead a third party, the law does not so require.  Opp'n 13.

18   They maintain that judicial economy would be served by allowing impleader, but state that "in the

19   event that the court would prefer that Defendants and Third Party Plaintiffs bring their claims

20   under Civil Rules 13(h) and 20(a)(2) Defendants would comply and amend their claims

21   accordingly, as these rules permit the joining of additional counterclaim defendants."  Opp'n 15.

22         In response to the TPPs' request that I allow joinder under Rule 20(a)(2), the TPDs argue

23   that it is inapplicable because "it has not been shown or plead [sic] that NovelPoster's owners are

24   joint tortfeasors with Defendants for the harm that NovelPoster alleges that Defendants caused."

25   Reply 4.

26         The TPPs may proceed with their FACTPC against Yancher and Grinberg.  Federal Rule

27   of Civil Procedure 20(a)(2) allows persons to be joined as defendants in an action if "any right to

28   relief is asserted against them jointly, severally, or in the alternative with respect to or arising out

United States District Court
Northern District of California

12

United States District Court
Northern District of California

1  of the same transaction, occurrence, or series of transactions or occurrences" and there is a

2  "question of law or fact common to all defendants will arise in the action."  FED. R. CIV. P.

3  20(a)(2).  Here, the TPPs are seeking to join Yancher and Grinberg in its attempt to seek relief

4  from NovelPoster arising from the parties' unsuccessful business relationship, and there are

5  undoubtedly questions of law and fact common to the TPDs.  While the TPPs may have

6  incorrectly tried to include Yancher and Grinberg as parties to this action under Rule 14 when they

7  should have done so under Rule 20, "a number of courts, in the interest of justice, have permitted

8  the recharacterization of claims where warranted."  *Nat'l Fire Ins. Co. of Hartford v. Nat'l Cable*

9  *Television Coop., Inc.*, No. 10-cv-2532, 2011 WL 1430331, at *3 (D. Kan. Apr. 14, 2011)

10  (recharacterizing request for impleader as one for permissive counterclaim).  I would do so here as

11  well and would allow properly pleaded claims against Yancher and Grinberg to proceed under

12  Rule 20.

13  ## II.      ADEQUACY OF PLEADING

14  ### A.  First Cause of Action:  Fraud and Conspiracy to Commit Fraud

15  "The elements of a cause of action for fraud in California are:  (a) misrepresentation (false

16  representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent

17  to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage."  *Kearns*, 567

18  F.3d at 1126 (citation, quotation marks, and emphasis omitted).

19  "The elements of an action for civil conspiracy are the formation and operation of the

20  conspiracy and damage resulting to plaintiff from an act or acts done in furtherance of the

21  common design."  *Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 869 P.2d 454, 457 (Cal.

22  1994) (citation omitted).  The pleading "must show that each member of the conspiracy acted in

23  concert and came to a mutual understanding to accomplish a common and unlawful plan, and that

24  one or more of them committed an overt act to further it.  It is not enough that the [alleged

25  conspirators] knew of an intended wrongful act, they must agree—expressly or tacitly—to achieve

26  it."  *Choate v. Cnty. of Orange*, 86 Cal. App. 4th 312, 333 (Ct. App. 2000).  Where "[t]he pleading

27  fails to sufficiently allege the existence of an agreement between defendants," it must be

28  dismissed.  *Parino v. BidRack, Inc.*, 838 F. Supp. 2d 900, 907 (N.D. Cal. 2011).

United States District Court
Northern District of California

1    With regard to conspiracy, the TPDs argue that the TPPs fail to allege that any of them

2    were aware that another person intended to commit a wrongful act and that there was an

3    agreement and intention to commit the act.  Mot. 10; Reply 4.  The entirety of the TPPs' response

4    is that they "successfully plead that both parties, Mr. Alex Yancher and Mr. Matt Grinberg, were

5    involved in a conspiracy to commit fraud, by describing in great detail in the FACC (for instance,

6    at ¶¶ 2, 3, 6, 9, 36, 53, 54)."  Opp'n 16.

7    With regard to the underlying fraud, the TPPs allege that NovelPoster's business broker's

8    listing made certain claims about NovelPoster's financial condition, such as that it sold 2,200

9    posters in 2012, had cashflow and EBITDA of $36,5000, and had an equal customer mix of repeat

10   wholesale buyers and online retail customers.  *See, e.g.*, FACTPC ¶ 98(a).  They claim that

11   Yancher sent this information to Canfield in a persistent attempt to solicit Canfield "to discuss

12   various business partnership arrangements."  FACTPC ¶¶ 21, 24, 98.  Based on these discussions,

13   the parties enter into an agreement according to which the TPPs would operate NovelPoster for a

14   share of the revenue.  However, the TPPs soon learn that the TPDs had misstated certain facts,

15   such as the extent of NovelPoster's expenses, and were unable to systematically verify

16   NovelPoster's sales.  *See, e.g.*, FACTPC ¶¶ 63, 65.  By this point, the TPPs had already expended

17   significant resources into NovelPoster.  FACTPC ¶ 74.

18   In contrast, the TPDs argue that "[m]any of the statements that Defendants claim are false

19   are not statements of fact at all, but rather sales talk, forward looking statements, and proposed

20   contract terms during a negotiation."  Mot. 11.  They contend that the broker listing "is all sales

21   talk and considered opinion that is not actionable fraud."  Mot. 11 (citing FACTPC ¶¶ 98); *see*

22   *also* FACTPC ¶ 21, Ex. B.

23   The TPPs fail to state a claim for fraud.  Although the FACTPC identifies many specific

24   and measurable claims, nowhere do the TPPs plead with particularity what is false or misleading

25   about those claims.  For example, the TPPs allege that the TPDs claimed that NovelPoster's cash

26   flow and EBITDA were $36,500, that its inventory was worth $5,000, and that its operating

27   margins were 60 percent.  FACTPC ¶ 98.  But the TPPs do not say that any of these statements are

28   untrue or deceptive.  To be clear, the TPDs are incorrect in dismissing such statements as mere

"sales talk" and puffery[5]—on the contrary, they are specific, measurable claims capable of verification—but the TPPs must plead more in the FACTPC to sustain a claim for fraud. To compound the problem, the opposition brief does not identify a single example of a fraudulent statement. *See* Mot. 16-17.

The TPPs assert that certain forward-looking statements are actionable as fraudulent. Opp'n 17 (citing FACTPC ¶¶ 62-66, 100-03). However, the authority the TPPs cite for the proposition that "[s]tatement of expectation and belief are[ ] actionable in the Ninth Circuit" relate to violations of federal securities statutes, not state and common law fraud, and do not apply. *See* Opp'n 17 (citing *Kaplan v. Rose*, 49 F.3d 1363, 1375 (9th Cir. 1994) (discussing Section 10(b) of the Securities Exchange Act of 1934), and *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1113 (9th Cir. 1989) (same)). To the extent that statements such as that NovelPoster "expects 2,600-unit sales of $120,000 in 2013" or that Yancher would introduce the TPPs to his contacts can be actionable, the TPPs do not explain how they were untrue or misleading when made. FACTPC ¶ 98.

The TPPs also fail to allege a conspiracy to commit fraud. While the FACTPC alleges many actions that Yancher and Grinberg took (at times together), it is devoid of any allegation of an agreement between them to commit fraud upon the TPPs. Accordingly, their First Cause of Action does not state a claim.

**B.  Second Cause of Action:  False Promise**

"In California, a cause of action for false promise may lie where a defendant uses a false promise in order to induce the plaintiff into entering a contract." *Gerawan Farming, Inc. v. Rehrig Pac. Co.*, No. 11-cv-1273, 2013 WL 1414637, at *10 (E.D. Cal. Apr. 8, 2013). "To prevail, the plaintiff must show that (1) the defendant made a false promise; (2) the defendant knew that the promise was false at the time it was made; (3) the defendant intended to induce the plaintiff's reliance; (4) the plaintiff actually and justifiably relied on the promise; and (5) the plaintiff suffered damages as a result of his reliance." *Id.*

---

[5] Specifically, the following sorts of statements alleged in the FACTPC can be actionable if untrue or misleading:  ¶¶ 98(a)(i)-(vii), 98(b), 98(c)(i)-(iii), 98(g)(i)-(ii), 98(g)(iv)-(v), 98(g)(vi)-(viii).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    The TPPs fail to state a claim for false promise.  The basis for this cause of action is the

2 TPPs' allegation that Yancher agreed to introduce the TPPs to certain contacts he had, but failed to

3 do so.  FACTPC ¶ 107.  But there is no allegation that Yancher knew that the promise was false at

4 the time it was made or that he never intended to carry out that promise, only that Yancher had not

5 yet done so.  The TPPs have made almost no argument concerning this cause of action and, with

6 regard to knowledge of falsity, only cite to a conclusory assertion relevant to the First Cause of

7 Action.  *See* Opp'n 18 (citing FACTPC ¶ 100).  Accordingly, this cause of action must be

8 dismissed.

9    **C.  Third Cause of Action:  Breach of Contract**

10    "Contracts are implied in fact where the parties' actions evince an intention to create a

11 binding contract."  *Design Data Corp. v. Unigate Enter., Inc.*, No. 12-cv-4131 PJH, 2013 WL

12 360542, at *5 (N.D. Cal. Jan. 29, 2013).  "An implied-in fact-contract shares the same elements as

13 an express contract, except that offer and acceptance are implied from the parties' conduct."

14 *Garibaldi v. Bank of Am. Corp.*, No. 13-cv-2223-SI, 2014 WL 1338563, at *3 (N.D. Cal. Apr. 1,

15 2014).  A plaintiff must plead "the facts from which the promise is implied must be alleged."

16 *Youngman v. Nev. Irr. Dist.*, 70 Cal. 2d 240, 247 (1969).  "Whether or not an implied contract has

17 been created is determined by the act and conduct of the parties and all the surrounding

18 circumstances involved . . . ."  *Del E. Webb Corp. v. Structural Materials Co.*, 123 Cal. App. 3d

19 593, 611 (Ct. App. 1981).  "Unlike the 'quasi-contractual' quantum meruit theory which operates

20 without an actual agreement of the parties, an implied-in-fact contract entails an actual contract,

21 but one manifested in conduct rather than expressed in words."  *Maglica v. Maglica*, 66 Cal. App.

22 4th 442, 455 (Ct. App. 1998).

23    "The elements for a breach of contract action under California law are:  (1) the existence of

24 a contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and

25 (4) damages to plaintiff as a result of the breach."  *Buschman v. Anesthesia Bus. Consultants LLC*,

26 No. 13-cv-1787-EMC, 2014 WL 1911430, at *5 (N.D. Cal. May 13, 2014).

27    The TPPs allege that their "business arrangement was not memorialized by a contract," but

28 that a "contract implied-in-fact was created" between the parties which assigned roles to both

16

parties.  FACTPC ¶ 113; Opp'n 18.  They claim that although the TPDs agreed to transfer all aspects of NovelPoster's operations to the TPPs, "it became clear that Third Party Defendants still desired to conduct a parallel business and execute transactions representing themselves as agents of Novel[P]oster," as shown by Yancher's issuing of an invoice on NovelPoster's letterhead. FACTPC ¶ 114.  Similarly, by attempting to terminate the contract, the TPPs allege that the TPDs tried to breach their agreement that the TPPs would run NovelPoster until it could be sold. FACTPC ¶ 115.  Finally, the TPPs plead that the TPDs failed to grant them 10 percent equity in NovelPoster and did not fulfill their obligation to create a new poster design monthly.  FACTPC ¶¶ 116-17.

The TPDs argue that the TPPs do not allege how the "contract implied-in-fact" was formed or what duties there are under the alleged contract.  Mot. 13.  Indeed, the TPDs argue that the TPPs are unable to plead breach of a contract implied-in-fact because the authorities cited by the TPPs "state that a contract implied-in-fact exists only where there is no writing evidencing the terms, as such writings show an express contract."  Reply 7.  The FACTPC, they suggest, essentially pleads the existence of a written contract.  "[A]s such[,] [the] allegations show the contract is *express*, not implied."  Reply 7 (original emphasis).

The TPPs fail to state a claim for breach of contract implied-in-fact because there is an express contract.  As the Ninth Circuit explained, "An action does not lie on an implied contract where there exists between the parties a valid express contract which covers the same subject matter."  *Rogers v. Am. President Lines, Ltd.*, 291 F.2d 740, 742 (9th Cir. 1961).  While the TPPs attempt to characterize the terms that the parties were discussing as a "proposed arrangement," *see, e.g.*, FACTPC ¶ 49, they are more than that because, as the TPPs allege, Canfield wrote to Yancher and Grinberg that "we agree to the email and to re-evaluate in 6 months to discuss new terms going forward," FACTPC ¶ 55, Ex. R.  The proposed arrangement constituted an offer and Canfield's response constituted an acceptance of those terms.  Based on the pleadings, an express contract existed and, thus, there was no contract implied-in-fact and no claim for breach of a contract implied-in-fact can be sustained.

United States District Court
Northern District of California

17

United States District Court
Northern District of California

### D.  Fourth Cause of Action:  Quantum Meruit

"Quantum meruit refers to the well-established principle that 'the law implies a promise to pay for services performed under circumstances disclosing that they were not gratuitously rendered.'" *Huskinson & Brown, LLP v. Wolf*, 84 P.3d 379, 381 (Cal. 2004) (citation omitted). "The claim applies especially where the defendant acquires the benefit with knowledge of the circumstances establishing unjust enrichment.  The plaintiff and a defendant need not be in contractual privity with each other; the plaintiff may recover on a quantum meruit theory from any other party even though no express or implied contractual relationship exists." *Precision Pay Phones v. Qwest Commc'ns Corp.*, 210 F. Supp. 2d 1106, 1112 (N.D. Cal. 2002) (Chen, J.).  In order to establish a claim for quantum meruit, the plaintiff must prove that:  (1) the plaintiff has rendered services that benefitted the defendant, and (2) the defendant would be unjustly enriched if the plaintiff was not compensated.  A plaintiff who has established these elements is entitled to recover the 'reasonable value' of the services provided." *Arrison v. Info. Res., Inc.*, No. 95-cv-3554-TEH, 1999 WL 551232, at *6 (N.D. Cal. July 16, 1999) (citation omitted).  "The plaintiff is not required to plead or prove the existence of a contract, but must show that 'the services were rendered under some understanding or expectation of both parties that compensation therefore was to be made.'" *Design Data Corp. v. Unigate Enter., Inc.*, No. 12-cv-4131 PJH, 2013 WL 360542, at *5 (N.D. Cal. Jan. 29, 2013) (quoting *Huskinson & Brown*, 84 P.3d at 381).

The TPPs allege that the TPDs benefited from the following:  (i) the Kentucky warehouse retained by the TPPs; (ii) "new channels for generating sales developed" by the TPPs; (iii) "marketing information procured" by the TPPs; (iv) "customer prospects procured" by the TPPs; (v) services performed at the TPDs' request, such as building a new website; and (vi) physical posters created by the TPPs.  FACTPC ¶ 119.  Even though the TPPs kept 80 percent of sales, they assert that their claim for quantum meruit "is for work performed outside that contemplated in the implied-in-fact contract."  Opp'n 19.  The TPPs claim that the TPDs benefited "by virtue of Plaintiff's making use of Defendants and Third Party Plaintiffs' efforts," which they "unjustly retained" at the TPPs' expense.  FACTPC ¶¶ 123-24.

The TPDs argue that the TPPs cannot state a claim for quantum meruit because they do not

dispute that they were paid their share of NovelPoster's revenue since the beginning of the business relationship.  Mot. 14 (citing FACTPC Exs. V, X).  They point out that according to the FACTPC, even after the parties' dispute occurred, the TPPs continued to make royalty payments to the TPDs while retaining their share.  Mot. 14.  Thus, they cannot argue that they did not receive the benefit of their bargain.  In addition, the TPDs reason that the TPPs cannot claim quantum meruit for any period after June 14, 2013, when the TPDs attempted to terminate the parties' agreement.  Mot. 15.

The TPPs fail to state a claim for quantum meruit.  To succeed on such a claim, the TPPs must establish that they rendered some service to the TPDs' benefit such that the TPDs would be unjustly enriched if the TPPs were not compensated.  The TPPs' services were clearly not intended to be gratuitous, but there is no allegation to sufficiently support the contention that the TPDs have been unjustly enriched in any manner.  The "services" the TPPs argue that they performed "outside that contemplated in the implied-in-fact contract," on the contrary, appear to be work the parties intended for the TPPs to do in "tak[ing] over all aspects of NovelPoster."  Indeed, the FACTPC alleges that Javitch said to the TPDs, "In reliance upon our agreement, we have incurred substantial expenditures related to our marketing efforts and operation of Novel Poster [sic].  These amounts include, but are not limited to the following:  Website programming fees to create a new website . . . Shipping costs . . . Advertising fees . . . costs covering time invested by us," etc.  FACTPC Ex. X.  In other words, the TPPs considered those items part of the "operation" of NovelPoster, but they now claim the TPDs gratuitously received them.  But to the extent those items were not in fact contemplated by the parties, the TPPs effectively controlled NovelPoster well after the attempted termination and continued to collect its revenues, a portion of which they then distributed to the TPDs and the rest of which they kept according to the agreement.  The TPDs therefore cannot be said to be unjustly enriched and the TPPs cannot maintain a claim for quantum meruit.[6]

---

[6] The TPDs argue in their motion and reply briefs that the TPPs are not entitled to quantum meruit for the time they spent defending this lawsuit.  Mot. 15; Reply 9.  A closer reading of the FACTPC does not reveal any such claim by the TPPs.  *See* FACTPC ¶¶ 118-128.  Nonetheless, I

United States District Court
Northern District of California

### E.  Fifth Cause of Action:  Breach of Implied Covenant

"The covenant of good faith and fair dealing, implied by law in every contract, exists to prevent one contracting party from unfairly frustrating the other party's right to receive the benefits of the agreement." *SocialApps, LLC v. Zynga, Inc.*, No. 11-cv-4910-YGR, 2012 WL 381216, at *4 (N.D. Cal. Feb. 6, 2012).  "Any action for breach of the implied covenant requires the existence of a contract." *Castro v. JPMorgan Chase Bank, N.A.*, No. 14-cv-1539-NC, 2014 WL 2959509, at *3 (N.D. Cal. June 30, 2014).  "[A]n implied covenant of good faith and fair dealing cannot contradict the express terms of a contract." *Storek & Storek, Inc. v. Citicorp Real Estate, Inc.*, 100 Cal. App. 4th 44, 55 (Ct. App. 2002).

The TPPs allege that the TPDs deprived them of the benefits of their agreement by failing to design an additional poster each month and by failing to grant them any equity, thereby breaching the implied covenant of good faith and fair dealing.  FACTPC ¶ 132.  In addition, they allege that the TPDs further breached the implied covenant by discouraging the TPPs from seeking legal counsel, "spurning" their "good faith efforts at reconciliation," and initiating this action.  FACTPC ¶ 133.

The TPDs argue that because there is no contract implied-in-fact, if the cause of action for breach of the alleged contract implied-in-fact is dismissed, this cause of action must be dismissed as well.  Mot. 15-16.  To the extent that breach of contract was sufficiently pleaded, the TPDs assert that the TPPs plead nothing more than a mere breach of contract.  Mot. 16.  In addition, because the TPPs' alleged discouraging of the TPPs from hiring counsel predated the agreement, it is not actionable.  Mot. 16.  Finally, to the extent the TPPs base their claim on the litigating of this action, the TPDs only filed this action in response to the TPPs' own actions.  Mot. 16.

The TPPs premise their allegation about the breach of the implied covenant of good faith and fair dealing on the alleged contract implied-in-fact.  *See, e.g.*, FACTPC ¶¶ 130, 136.  Because they have not successfully pleaded the existence of such a contract, there can also be no implied covenant that was breached.  But even if I construed this cause of action as applying to what is

am skeptical that such a claim can be maintained.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  likely to be an express contract between the parties, the TPPs still would not be able to state a

2  claim because they do not adequately plead how any of the TPDs' actions violated the implied

3  covenant of good faith and fair dealing.  Yancher's suggestion that the parties not retain an

4  attorney is not actionable because "the implied covenant is a supplement to an existing contract,

5  and thus it does not require parties to negotiate in good faith prior to any agreement."  *McClain v.*

6  *Octagon Plaza, LLC*, 159 Cal. App. 4th 784, 799 (Ct. App. 2008).  On the other hand, the TPPs

7  have cited no authority stating that a party to a contract may not sue the other party without

8  violating the implied covenant of good faith and fair dealing if the suing party believed the

9  contract was breached.  Nor does the allegation that the TPDs "spurn[ed] Defendants and Third

10  Party Plaintiffs' good faith efforts at reconciliation" satisfy even the most lenient understanding of

11  Rule 8's pleading requirements.  FACTPC ¶ 132.  Finally, the TPPs' allegation that the TPDs'

12  failure to design a new poster monthly or to provide them with equity is nothing more than an

13  alleged breach of the express terms of the contract and is not actionable under this type of claim.

14  This cause of action fails.

15        **F.  Sixth Cause of Action:  Conversion**

16        "Conversion is the wrongful exercise of dominion over the property of another.  The

17  elements of a conversion claim are:  (1) the plaintiff's ownership or right to possession of the

18  property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and

19  (3) damages."  *Burlesci v. Petersen*, 68 Cal. App. 4th 1062, 1066 (Ct. App. 1998).  "Money can be

20  the subject of an action for conversion if a specific sum capable of identification is involved."

21  *Farmers Ins. Exch. v. Zerin*, 53 Cal. App. 4th 445, 452 (Ct. App. 1997).

22        The TPPs allege that because the TPDs "interfered and obstructed" their operation of

23  NovelPoster and "constructively forced" them "to cease operation of Novel[P]oster," the TPDs

24  "wrongfully converted and retained . . . revenues that were generated" by the TPPs.  FACTPC

25  ¶¶ 142-43.  The TPDs actions, the TPPs claim, caused them to suffer over $100,000 in damages.

26  FACTPC ¶ 145.

27        The TPDs argue that the cause of action for conversion fails because the TPPs have no

28  property interest in the "revenue" that is allegedly theirs—that revenue, the TPPs contend, belongs

United States District Court
Northern District of California

1    to NovelPoster and the TPPs have already pleaded that they took the 80 percent due to them under

2    the agreement.  Mot. 17-18.  To the extent the TPPs allege that the TPDs converted resources that

3    the TPPs invested into NovelPoster, the TPPs assert that that "is not anyone's personal property,"

4    but if those resources are anyone's property, they are NovelPoster's.  Mot. 18-19.

5          The TPPs fail to state a claim for conversion.  At least in the FACTPC, they do not explain

6    what ownership or right to possession they have over the claimed "revenues" or, indeed, of what

7    these revenues consist.  The TPPs' opposition brief suggests that they are only asserting a right to

8    retain the 80 percent of revenues due to them under the parties' agreement.  Opp'n 21.  The brief

9    states that the "Plaintiffs' malicious behavior deprived Defendants of that right to retain that

10   property."  Opp'n 21.  But that argument is completely belied by the pleadings, which show that

11   the TPPs retained control of NovelPoster's revenue flow and kept the 80 percent due to them.  *See*

12   FACTPC ¶¶ 79, 85, Ex. Y.  To the extent the TPPs are claiming a right to future revenues, that

13   claim cannot be sustained because they do not have an immediate right to such revenues, such a

14   claim is merely a right to payment, and the sum is indefinite.  *Farmers Ins. Exch. v. Zerin*, 53 Cal.

15   App. 4th 445, 452 (Ct. App. 1997) ("A party need only allege it is '*entitled to immediate*

16   *possession at the time of conversion.*'  However, a mere contractual right of payment, without

17   more, will not suffice.") (citation omitted).  This cause of action fails.

18        **G. Seventh Cause of Action:  False Advertising Law**

19        The FAL prohibits any "unfair, deceptive, untrue, or misleading advertising."  *Williams*,

20   552 F.3d at 938.  The statute prohibits "not only advertising which is false, but also advertising

21   which, although true, is either actually misleading or which has a capacity, likelihood or tendency

22   to deceive or confuse the public."  *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 950 (2002) (brackets and

23   quotation marks omitted).  The plaintiff must show that the challenged statements will mislead an

24   "ordinary consumer acting reasonably under the circumstances."  *Lavie v. Procter & Gamble Co.*,

25   129 Cal. Rptr. 2d 486, 498 (Ct. App. 2003). "In determining whether a statement is misleading

26   under the statute, the primary evidence in a false advertising case is the advertising itself," and the

27   "misleading character of a given representation appears on applying its words to the facts."

28   *Colgan v. Leatherman Tool Group, Inc.*, 38 Cal. Rptr. 3d 36, 46 (Ct. App. 2006) (citations and

quotation marks omitted).  A plaintiff must have "suffered injury in fact and [ ] lost money or property" in order to have standing to bring an FAL claim.  CAL. BUS. & PROF. CODE § 17535.

The TPPs allege that the TPDs or their agents have attempted to sell NovelPoster through at least eight different websites using statements they knew or should have known was illegal, untrue, or misleading to a reasonable consumer.  FACTPC ¶¶ 149-51.  These statements included specific claims about NovelPoster's financial indicators and sales figures.  FACTPC ¶ 151.  The statements deceived the TPPs and remain online, where "the general public will continue to be damaged by this unfair competition."  FACTPC ¶ 159.

The TPDs argue that the TPPs lack standing to bring this cause of action because they have not pleaded that they were injured by the misstatements.  Mot. 20.  In particular, they point to the fact that although Canfield saw the challenged statements, he declined to purchase NovelPoster and the TPPs "negotiated an agreement that was completely different from the advertisement."  Mot. 20; FACTPC ¶¶ 21-23.  Further, the TPDs contend that "[b]ecause [the TPPs] had the opportunity to review materials and verify the numbers in the advertisement, Defendants did not rely upon the statements in the advertisement for the sale of the business" and "did not suffer an injury as an immediate result of the advertisement."  Mot. 20.

The TPDs also accuse the TPPs of raising a "novel argument" that advertisements for the sale of a business between two sophisticated parties can be actionable under the FAL.  Mot. 21.  Because California courts apply a "reasonable consumer standard," the TPDs assert that the TPPs "cannot show that a reasonable consumer would have been deceived by the purported false statements because an ordinary consumer does not purchase a business."  Mot. 21.

The TPDs are wrong in several respects.  As one court explained, "the standard applied in UCL and false advertising cases is that of the ordinary consumer acting reasonably under the circumstances.  Where the advertising or practice is targeted to a particular group or type of consumers, either more sophisticated or less sophisticated than the ordinary consumer, the question whether it is misleading to the public will be viewed from the vantage point of members of the targeted group, not others to whom it is not primarily directed."  *Lavie v. Procter & Gamble Co.*, 105 Cal. App. 4th 496, 512 (Ct. App. 2003).  That principle applies here.  In addition, it does

23

United States District Court
Northern District of California

not matter that the TPPs did not purchase NovelPoster because the crux of their FACTPC is that they were misled into entering a business relationship with the TPDs based on the TPDs' allegedly false or misleading statements and thus the TPPs were harmed.  Finally, the TPDs' assertion that the TPPs "took time to review documents" is unsupported in the pleadings, but even if it was pleaded, the fact that documents were reviewed is meaningless if the allegation is that those documents were false or misleading.

The TPDs argue that the TPPs fail to plead with particularity how the challenged statements are false or misleading.  Mot. 22.  They point to the fact that the FACTPC simply asserts that, "[b]ased on information and belief, these statements are false and/or misleading."  Mot 22 (citing FACTPC ¶ 152).  The only specific statement that the TPPs identify as false is that NovelPoster "expects 2,600-unit sales of $120,000 in 2013."  FACTPC ¶ 152.  However, the TPDs point out that the TPPs do not explain how a future expectation is false unless the speaker did not believe it when the statement was made:  indeed, the TPPs allege that on April 23, 2013, Yancher stated that "if $30K was spent on ads, we'd do around $150K in sales."  FACTPC ¶ 32, Ex. E.  The TPDs assert that because there is no allegation that the statement was false or misleading when made, it cannot be actionable.

The TPPs' only response is that this statement "is verifiably false based on common sense alone" without further explanation.  Opp'n 23.

The TPDs are correct that the TPPs fail to state a claim.  As explained above while discussing the cause of action for fraud, the TPPs simply do not identify statements that are allegedly false or misleading and explain why they are so.  The sole statement to which the TPPs point is, as the TPDs correctly argue, nothing but a belief about future prospects—a belief about which the TPPs allege facts suggesting that Yancher indeed believed it.  The TPPs do not allege how any other claim is false or misleading, and therefore their FAL cause of action fails.[7]

_____

[7] The TPDs argue that the TPPs improperly request disgorgement, which cannot be claimed under the FAL or UCL.  I agree.  As one California court explained, "Damages are not available under the False Advertising and Unfair Competition Laws because restitution is the only available remedy under those statutes."  *Colgan v. Leatherman Tool Grp., Inc.*, 135 Cal. App. 4th 663, 695 (2006).

United States District Court
Northern District of California

1

**H.  Eighth Cause of Action:  Unfair Competition Law**

The TPPs do not dispute that the basis for their UCL cause of action is essentially identical to that for their FAL cause of action.  *See* Opp'n 22-23.  Accordingly, their UCL cause of action fails for the same reason their FAL cause of action fails.

**I.   Ninth Cause of Action:  Intentional Interference with Prospective Economic Advantage**

The elements of an interference with prospective economic advantage claim are "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." *CRST Van Expedited, Inc. v. Werner Enters., Inc.*, 479 F.3d 1099, 1108 (9th Cir. 2007) (quoting *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003)).  A plaintiff must "allege an act that is wrongful independent of the interference itself." *Id.* (citing *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376, 392–93 (1995)).  "[A]n act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." *Korea Supply*, 29 Cal. 4th at 1159.

To show an economic relationship, "the cases generally agree that it must be reasonably probable the prospective economic advantage would have been realized but for defendant's interference." *Youst v. Longo*, 43 Cal. 3d 64, 71 (1987).  Any alleged relationship cannot be based upon "overly speculative expectancies," and a seller of some good must show "an existing relationship with an identifiable buyer." *Westside Ctr. Assocs. v. Safeway Stores 23, Inc.*, 42 Cal.

---

The TPDs also argue that the TPPs are not entitled to attorney's fees under California's Code of Civil Procedure § 1021.5 because no significant benefit was conferred on the general public:  only one business was for sale and the advertisements do not affect a broad class of person.  Mot. 23-24.  The TPPs respond that the "Plaintiffs have maintained and/or expanded their false advertising across websites for months, before, during and after the Novel[P]oster fraud," and thus the public may be harmed by their actions.  Opp'n 22.  I do not decide this issue now and will await any motion for attorney's fees to address it if necessary.

App. 4th 507, 522, 527 (Ct. App. 1996).  Not requiring an allegation of an existing relationship "allows recovery no matter how speculative the plaintiff's expectancy.  It assumes what normally must be proved, i.e., that it is reasonably probable the plaintiff would have received the expected benefit had it not been for the defendant's interference." *Westside Ctr. Assocs.*, 42 Cal. App. 4th at 523.

The TPDs assert that they cannot be found liable under this cause of action because Yancher and Grinberg are the agents of NovelPoster, and it was they who terminated the parties' agreement, so they could not have "disrupted" any economic relationship.  Mot. 24.  In addition, the TPDs reason that it makes no sense to claim disruption of a prospective economic advantage while claiming that NovelPoster's financial health was weaker than the TPDs portrayed.  Mot. 24.  Finally, the TPDs argue that the TPPs fail to allege an independently wrongful action.

The TPPs allege that the TPDs interfered with their operation of, and contract with, NovelPoster.  FACTPC ¶¶ 181-83.  The TPPs claim that the TPDs' actions led them to incur losses in defending this litigation and because they were unable to realize financial gains from continuing to operate NovelPoster until it could be sold.  FACTPC ¶ 185.  The only effort the TPPs make to support their cause of action in their brief is by citing to 100 paragraphs of their complaint—"more specifically," 31 of those 100—with absolutely no argument beyond nakedly asserting that "Defendants successfully plead the [ ] elements."  Opp'n 23 (citing FACTPC ¶¶ 1-96, 98-99, 185-86).

The TPPs fail to state a cause of action for intentional interference with prospective economic advantage.  Because I conclude that the TPPs have not successfully pleaded any other cause of action, they cannot show an independently wrongful act that can serve as the basis for this claim.  Accordingly, this cause of action must also be dismissed.

United States District Court
Northern District of California

1

**CONCLUSION**

2      For the reasons above, the Motion to Dismiss is GRANTED.

3      I will grant the TPPs leave to amend their counterclaim and third-party complaint within

4  15 days of the date below.  I remind counsel of their obligations under Rule 11(b) of the Federal

5  Rules of Civil Procedure.

6      **IT IS SO ORDERED.**

7  Dated:  August 14, 2014

8



WILLIAM H. ORRICK
United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28