```
                                                    Pages 1 - 18

                  UNITED STATES DISTRICT COURT

                NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Orrick, Judge

NOVELPOSTER,                          )
                                      )
          Plaintiff,                  )
                                      )
VS.                                   )   NO. 13-cv-05186
                                      )
JAVITCH CANFIELD GROUP,               )
                                      )
          Defendant.                  )
_____)

                              SAN FRANCISCO, CALIFORNIA
                              WEDNESDAY, JANUARY 21, 2015
```

**TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
       RECORDING (FTR TIME: 2:40 P.M. TO 3:04 P.M.)**

**APPEARANCES:**

| | |
|---|---|
| For Plaintiff: | Ad Astra Law Group, LLP<br>582 Market Street, Suite 1015<br>San Francisco, CA 94104 |
| BY: | **KEENAN NG, ATTORNEY AT LAW**<br>**MICHAEL DORSI, ATTORNEY AT LAW** |
| For Defendant: | Orrick Herrington and Sutcliffe LLP<br>1000 Marsh Road<br>Menlo Park, CA 94025 |
| BY: | **SCOTT LINDLAW, ATTORNEY AT LAW**<br>**NEEL CHATTERJEE, ATTORNEY AT LAW** |
| For Defendant: | Willey & Bentaleb LLP<br>JPMorgan Chase Building<br>560 Mission Street, Suite 1300<br>San Francisco, CA 94105 |
| BY: | **CARLTON WILLEY, ATTORNEY AT LAW** |
| Transcribed: | Carrie E. McKee-Parks<br>Transcriber 510-637-9897<br>McKee-Parks65@att.net |

| | |
|---|---|
| 1 | Wednesday, January 21, 2015                              2:40 p.m. |
| 2 | P R O C E E D I N G S |
| 3 | ---oOo--- |
| 4 | MR. CHATTERJEE: Good afternoon, your Honor. Neel |
| 5 | Chatterjee for the defendants. Also with me is my colleague, |
| 6 | Scott Lindlaw. |
| 7 | MR. WILLEY: Good afternoon, your Honor. Carlton |
| 8 | Willey also for defendant Mark Javitch. |
| 9 | THE COURT: Mr. Willey. Mr. Chatterjee, welcome to |
| 10 | the fray. |
| 11 | MR. NG: Good afternoon, your Honor. Keenan Ng on |
| 12 | behalf of plaintiff and counter-defendant. |
| 13 | MR. DORSI: Michael Dorsi on behalf of defendant and |
| 14 | counter-defendants. |
| 15 | MR. CHATTERJEE: And, your Honor, with the Court's |
| 16 | permission, I'll be addressing the Computer Fraud and Abuse Act |
| 17 | and CDAFA issues. |
| 18 | THE COURT: Okay. |
| 19 | MR. CHATTERJEE: (Inaudible.) |
| 20 | THE COURT: Okay. Great. |
| 21 | Well, so I'm going to tell you what I think all at once and |
| 22 | it won't take me very long. And then you can pinpoint me on |
| 23 | where I should -- how I should be thinking differently about |
| 24 | this case. |
| 25 | With respect to the motion to dismiss the third amended |

```
 1    complaint, I'm inclined to deny it, I think, at this point.
 2    There is sufficient allegations of fraud and breach of contract
 3    and the UCL.  They were laid out in the last order and I
 4    think -- I think there are claims that can go forward.
 5         With respect to the cross motions for summary judgment,
 6    besides allowing Mr. Grinberg's motion to withdraw his
 7    admission -- because I think that was a probable typo and I
 8    don't see real prejudice -- I'm inclined to deny everything.
 9         And the reason that I think I have to deny everything is
10    that all the claims hinge on the meaning of a contract that
11    nobody seems to be able to agree on.
12         And the CFAA and CF -- CDFA claims all hinge on
13    authorization.  And authorization depend -- if you take -- if
14    you think that the May 8th e-mail controls, then the question
15    is does take overall aspect of operations; what does that mean
16    with respect to the e-mail accounts when NovelPoster has
17    ownership of the accounts and when the preface to that e-mail
18    discusses NovelPoster's need to have access to the accounts.
19         So I think at the end of the day, this is all going to
20    rely -- this case is going to come down to the credibility of
21    the parties as they discuss what the contract is and -- and
22    that's something that I'm not going to be able to determine on
23    the basis of the papers.
24         So let me hear, I think first, from NovelPoster on -- and
25    take on all of the issues in a way that target something that I
```

```
 1   could -- that would turn me around.  I'm pretty familiar with
 2   this case, as you know.
 3           MR. DORSI:  Sure.  For purposes of this motion, we
 4   have a -- an agreement in the papers; both on our motion and on
 5   their motion; that the May 8th e-mail is the contract.
 6           THE COURT:  The motion -- for the motion for summary
 7   judgment.
 8           MR. DORSI:  For both my motion for summary judgment
 9   and their motion for summary judgment.
10           THE COURT:  I -- that I understand.
11           MR. DORSI:  So --
12              (Inaudible due to simultaneous colloquy.)
13           THE COURT:  And the amended complaint --
14              (Inaudible due to simultaneous colloquy.)
15           THE COURT:  Just so I'm -- we've got all the cards on
16   the table; in the third amended counterclaim, that's not the
17   contract that the defendants are asserting so go ahead.  Okay.
18           MR. DORSI:  Okay.  So taking that e-mail as the
19   contract, which says that NovelPoster maintains ownership of
20   all NovelPoster accounts, then it doesn't matter whether the
21   defendants had a right to do what they did before they
22   termination.
23       If NovelPoster owns the accounts, then NovelPoster can say
24   you're done.  You're done as a matter of law.  And you have no
25   right to continue accessing my accounts.  So it doesn't matter
```

1    whether NovelPoster breached the contract by making that
2    statement.  If so, maybe NovelPoster owes some damages.
3         But by NovelPoster's saying you're done; get out of my
4    accounts.  And I think you can look at that e-mail and there's
5    no way that the termination e-mail can be construed as meaning
6    that they can -- that Mr. Javitch and Mr. Canfield can so
7    access the account.  And if there was any question about that,
8    Mr. Javitch's response the next day says -- clearly understands
9    the e-mail, just disagrees with its legal effect.
10        So you have a termination of the contract.  At which point,
11   any action after that date is without authorization.  And most
12   importantly, it denies an authorized user; that is,
13   NovelPoster; access to NovelPoster's accounts.  And that's the
14   (C)(5) claim under the California CDAFA.
15        The -- in addition, the e-mail in question says NovelPoster
16   will need continuing access to its accounts.  There's no way to
17   construe that other than NovelPoster will need continuing
18   access to its accounts, which it didn't have.
19             THE COURT:  Well, that wasn't a term, though.  The
20   two terms that I see -- that was in the preface to the -- the
21   terms.  But the terms -- one is they take over all aspects of
22   the operations.  That's what you agreed to with the defendants.
23   And then the -- then there's the other term that says
24   NovelPoster has ownership of the accounts.
25        So -- so I think that's -- that's the conundrum in this

1      case.  And then I realized that for purposes of the motion for
2      summary judgment, the defendants have agreed to a version of
3      the contract that they don't actually think is the contract.
4      But that's certainly in my mind as I'm -- as I'm looking at all
5      this.  Mr. Chatterjee.
6              MR. CHATTERJEE:  Your Honor, I'd like to address this
7      ownership issue because I do think it's somewhat of a red
8      herring.
9          I'll give you an example.  I can own a house and I can rent
10     it to somebody else.  That doesn't mean I get unfettered access
11     just to take it back.  I have a rental agreement and the rental
12     agreement is going to cover when I'm allowed to reenter and
13     take possession back.
14         Here, we have an agreement where it's unambiguous on the
15     May 8th e-mail as far as what the plaintiff is asserting that
16     we are now to control all of the operations.
17         And not only are we going to control all the operations,
18     the course of performances is they give us all the password
19     data.  We tell them we're going to migrate everything to our
20     own website and they accede it to.
21         So not only do we have what the agreement says, we have an
22     indication of what the people meant because they actually did
23     it.  The fact that they own the data doesn't affect the CDAFA
24     or CFAA claims at all.
25             THE COURT:  But --

1	MR. CHATTERJEE: Because --

2	THE COURT: On the May 8th agreement, how long do you

3	have control of the operation?

4	MR. CHATTERJEE: Excellent point, your Honor.

5	If you look at Exhibit -- Exhibit L and Exhibit E to the

6	Lindlaw declaration, there was actually a statement made in

7	response to the e-mail saying we'll go six months and then

8	renew. And in Exhibit E is Mr. Yancher's deposition where he

9	says he agreed to that term.

10	So we know that there was a term that was agreed to through

11	the course of that e-mail where they said it's going to have a

12	six-month term.

13	So there's nothing in there -- there's nothing in the

14	written agreement; there's no parole (phonetic) evidence;

15	there's no back and forth that says this agreement is

16	terminable at will.

17	What they're trying to do now is they're trying to impose a

18	term that no party ever negotiated. How can they do that and

19	then say that somehow there's an authorization violation?

20	THE COURT: Well -- so how am I supposed to -- I

21	mean, you're -- how am I supposed to understand the -- the

22	May 8th -- how am I supposed to construe the May 8th so-called

23	contract given its sparseness and the radically conflicting

24	views of the people who entered into it?

25	MR. CHATTERJEE: You made reference to that in your

1     motion to dismiss, your Honor.
2         In your motion to dismiss, you cited the PG&E case.  It's
3     contract interpretation.  A lot of the parties talk about
4     whether they negotiate; and if there's an ambiguity, what did
5     they say to each other that would aid in the interpretation of
6     the agreement.
7             THE COURT:  So then you would agree with me that I
8     need extrinsic evidence.  I don't have it now.  And -- and
9     there's -- this is all balled up in a question of fact that the
10    jury is going to have to sort out.
11            MR. CHATTERJEE:  I don't agree with you on that, your
12    Honor.  I do think the agreement is clear and we have a course
13    of performance; right?  We know when they say -- the issue that
14    your Honor is having is what do they mean when they said that
15    my clients get control of all operations.
16        What does it mean when we manage the website and the social
17    media presence?  Does that /EUP collude though things such a
18    password accounts and e-mails?
19        Well, what we know is is that under that agreement, that in
20    fact happened.  The parties actually did that.  There's no
21    factual dispute that that's what happened.
22        Where things went awry is afterwards.  Weeks later all of a
23    sudden, NovelPoster had a change of heart and said we want it
24    back.  There's no provision on the agreement that says you can
25    do that.  They're trying to put in place a provision to that

1    May 8th e-mail that they haven't introduced any extrinsic
2    evidence.  It's an entirely new term.
3             THE COURT:  Well, but they did say at the beginning
4    of the e-mail before the terms start getting written we need to
5    have access to the accounts.  And that's something you're just
6    totally blowing off; right?
7             MR. CHATTERJEE:  No, your Honor.  They actually
8    responded to that.  The defendants actually responded to that.
9    And they said that the way that this information is getting
10   migrated, we can't do that.  That was after the May 8th e-mail
11   that that discussion occurred that they're talking about is
12   actually maybe a week or two later.
13        But as far as the terms that are in here, the terms were
14   articulated in the May 8th e-mail.  There was a term set on it
15   of six months and then the parties behaved accordingly.
16        Now, they're coming in here asserting a violation of a
17   criminal statute.  And it is not -- it does not rise to a
18   criminal act to have a disagreement as to what parties intended
19   when they signed the agreement.  Certainly, the law should not
20   have (inaudible.)
21            THE COURT:  Well, my gut tells me you're right.  The
22   cases that I've read don't support that at the moment.  And I
23   think we're going to have to have a fuller factual record
24   before -- before that determination gets made.
25            MR. CHATTERJEE:  Your Honor, the *Nosal* (phonetic)

1    case certainly suggests that that's a dangerous way to expand
2    the scope of the Computer Fraud and Abuse Act; to say that
3    we're going to transform breach a contract causes of action
4    into what is otherwise a criminal violation.
5         Normally, when you look at the CFAA and CDAFA case, there
6    is some sort of culpable conduct.  We raised this in our papers
7    or we talk about that; the mens rea issue.
8         There's some sort of appreciation of wrongfulness of one's
9    actions.  Here, we have a good faith dispute.  We think we're
10   right.  We think the contract says what it says and we're
11   allowed to do what we did.  And the parties, in fact, did that.
12        But that doesn't transform this into an intentional act
13   that could give rise to criminal liability.
14             THE COURT:  Well, that's one way of looking at it.
15   And that's certainly yours.  But I think NovelPoster's is there
16   was -- they had the right to terminate.  Your client received
17   the notice of termination; and instead of doing what most
18   people would have done in that situation, decided to hang on
19   and lock out the people who had run the -- who had run the
20   business and run the e-mail accounts for -- until the lawsuit
21   got filed in this court.
22        So -- so there's, under the act, some basis to say that
23   both of those computer fraud acts were violated.
24             MR. CHATTERJEE:  Your Honor, they still have -- if we
25   wrote a motion to dismiss, I might be arguing a different set

1  of issues. But here, they didn't put in any evidence of that.
2  All they -- they didn't put in any evidence that there was an
3  agreed upon, contractual term that made this agreement
4  terminable at will. They put in nothing on that.
5  They didn't put in any parole (phonetic) evidence; any
6  negotiation history; any discussion about the terms that made
7  them somehow ambiguous. And on summary judgment, that's what
8  they have to do. They didn't do that.
9  Instead, where your Honor is is interpreting the contract
10  as looking at the language of the contract; looking at what the
11  parties actually did; and what was actually discussed.
12  THE COURT: Okay. So I've heard that. So from
13  NovelPoster, what else would you like to say on that?
14  MR. DORSI: There's a couple things that
15  Mr. Chatterjee said that I think are important for this Court
16  to consider.
17  The first one is this analogy; the landlord tenant law.
18  The fact is that the landlord tenant law is dis-analogous to
19  everything else because the lease doesn't control. You simply
20  cannot evict someone because you feel like it. You have to go
21  through court procedure.
22  Executory contracts are the opposite; are the exact
23  opposite of that; that a party who is the possessor, say, of a
24  house with work being done on that house can say you're done.
25  Get off my lawn. And they have that absolute right. So if

1  NovelPoster --
2           THE COURT: That's actually one of my favorite
3  comments. Get off my lawn.
4           MR. DORSI: So Mr. Javitch, Mr. Canfield, get off my
5  lawn. There's no other way to construe the termination e-mail.
6      So it doesn't matter whether the contract was terminable at
7  will. If my client's revocation of authorization was a breach
8  of the contract, that's an argument for their counterclaim.
9  That's not an argument for why they had authorization after
10 that date.
11     But let's take it a step further. If you don't buy that,
12 you can point to what Mr. Chatterjee just pointed to where he
13 said we would reevaluate in six months. Six months came in
14 November of 2013. Defendants maintained control of the
15 accounts after November of 2013. After clear and unambiguous
16 statements from Ms. Young, who was counsel for my clients by
17 that time; but at that time, they had to give the accounts back
18 and they didn't.
19     So at a minimum, we would have a (C)(5) violation from
20 November of 2013 until January of 2014.
21          THE COURT: Okay. I was just looking for that
22 May 8th e-mail because I don't remember seeing the six months
23 in it. And now that I'm looking at it, I still don't see it.
24          MR. CHATTERJEE: But -- your Honor, it's -- it's --
25 the original agreement does not have that. And what -- and if

```
 1        you look at Exhibit L, there's an e-mail string back and forth
 2        where they agree to that as an amendment to the original.
 3                  THE COURT:  You know, the -- I think the reality is
 4        going to be you -- in your amended -- third amended
 5        counterclaim, you've stated a different contract.  And my guess
 6        is that the jury is going to look at all of the terms and all
 7        those e-mails and put them all together and then figure them
 8        out.
 9             But on summary judgement, based on the May 8th document, I
10        think you've got a problem so --
11                  MR. CHATTERJEE:  Your Honor, may I address one other
12        issue associated with this?
13                  THE COURT:  Yes, please go ahead.
14                  MR. CHATTERJEE:  So in addition to the contractual
15        issue, there is a very significant causation problem, which we
16        presented in our brief where they have introduced various
17        pieces of evidence about dollar values, but they're not tied at
18        all to the real actions that they're accusing of the wrongful
19        conduct.
20             They -- they -- there is a requirement under both the CDAFA
21        and the CFAA that they actually be tied together.  One of the
22        things that they put in are things like attorney's fees for
23        them to file the lawsuit.  Also, just, your Honor, those are
24        not compensable as the type of harm that grants standing under
25        CDAFA or CFAA.
```

1          THE COURT: I agree with you. But isn't it true that
2     their attempts to try to get those e-mail accounts back from
3     you should be compensable?
4          MR. CHATTERJEE: Well, your Honor, it's not clear
5     from the materials that they submitted what those were. They
6     kind of come in and they say -- they make some generalized
7     allegation of 700 hours to try and get them back.
8          And then when we deposed their principles -- when we
9     deposed their principles, they say we don't even know what it
10    means to say -- to get the information back.
11         But then on summary judgment, they come out and they
12    controvert what they said in the deposition and say something
13    quite different and say it was 700 hours.
14         But fundamentally what they did was they said they called
15    their lawyers and their lawyers sent a letter and they started
16    preparing a lawsuit. There's no evidence of any actual damage
17    or loss that's tied to any of these violations. Calling your
18    lawyers to file a lawsuit is not the type of thing that's
19    compensable under the statutes.
20         And that's the mitigation efforts that you're -- that I
21    think your Honor is preparing to --
22         MR. DORSI: If I may briefly, your Honor? I think
23    that the core issue there was already briefed about which fees
24    are compensable and which aren't.
25         But one thing I do need to say here because it was -- they

1   brought in reply evidence with depositions so I need to know
2   for the record that on pages 234 to 236 of the deposition of.
3   Alex Yancher, which can be found at ECF number 181-2, pages 17
4   through 19.
5        Counsel for defendants asked some very poorly-framed
6   questions.  To the extent this Court finds that evidence
7   relevant, the motion -- the objection stated in the record to
8   the mischaracterization of former testimony to vagueness as to
9   the term "damage" to generally vague and ambiguous questions;
10  to questions that call for legal conclusions; and vagueness as
11  to the term "investigation" should all be sustained.
12       In addition, on page 181 of the deposition of Matt Grinberg
13  as the designee for NovelPoster, ECF number 181-2, page 25.  To
14  the extent that the Court finds this evidence relevant to the
15  motion, the stated objection that the question is overbroad and
16  vague should be sustained.
17           THE COURT:  Okay.  Thank you.  So, let me -- did you
18  have one more thing you wanted to say?
19           MR. CHATTERJEE:  I just wanted to say; the point he's
20  making is that when we asked Mr. Yancher what kind of
21  investigation did you do, he said he didn't understand the
22  question.
23       And when he comes in on his declaration to try and
24  establish the causation and the jurisdictional prerequisite, he
25  says "my investigation took."  So he couldn't understand the

1    depo. Now, he's saying something different in his
2    declarations. Pretty straightforward issue.
3                THE COURT: Okay. Well, I will look at that and I'll
4    take this under submission.
5        Let me just say a couple of things. Mr. Willey has
6    probably heard this more than he wishes that he had. I -- this
7    case raises a lot of interesting issues. I hope everybody here
8    is clear-eyed on the damages.
9        You know, the first month that this -- that your client had
10   the company; the NovelPoster; and they hadn't done anything
11   wrong. NovelPoster made, what, $400 the entire time that the
12   defendants were operating the business; the revenue was
13   $23,000; the amount of attorney's fees that have been spent in
14   this case so far has got to exceed half a million dollars.
15       There's going to be a -- at least a two-week jury trial I
16   think coming up because this is -- every principle is going to
17   be on the stand for a while and it's going to be a credibility
18   matter.
19       This is so expensive and I suspect that the verdict is
20   going to be small. And I suspect that when somebody tries to
21   file an attorney's fees claim; if they prevail on the state law
22   claim; that the Judge who hears that is going to remember
23   having warned the parties from the very beginning about the
24   resources that have gone into this case.
25       So I hope you all just have a clear perspective on that

```
 1    going into your settlement conference.  And I'll just also
 2    remind you; you have a lot of work to do to prepare for the
 3    pretrial conference.  And by February 9th, you should -- you
 4    have to exchange jury instructions; voir dire; exhibits;
 5    motions In Limine.  So we are -- we're going to trial.  That's
 6    why I'm here; okay?
 7         And I don't think I'm granting summary judgment for
 8    anybody, but I will take a look at this and so just keep all
 9    that in mind, if you would.
10         Mr. Willey, was there anything you wanted to say?
11              MR. WILLEY:  Your Honor, a couple things.  I have
12    heard the settlement talk a couple of times.  And honestly, it
13    is the CFAA and the attorney's fees hook that is precluding
14    settlement and will continue to.  If you --
15              THE COURT:  Well, I hope that what I just said will
16    have some impact on people's thinking because it is -- if
17    somebody thinks they're going to get $500,000 for winning
18    $20,000 in this case, they're wrong.  They're just flat wrong.
19         It's been a total -- actually, I shouldn't say anything
20    more than that because I do think the legal issues are
21    interesting.  I think the con -- I think every issue is
22    interesting and I'll look forward to seeing what the jury does
23    with it.
24         But I'm just saying that people have inflated notions
25    about -- if people have inflated notions and that's what's
```

```
1     holding you back, you should deflate them.
2              MR. WILLEY:  Very lastly, your Honor.  It seems that
3     plaintiffs have made some headway in convincing the Court that
4     this entire e-mail on May 8th is somehow now -- has now become
5     the contract.
6              THE COURT:  I can promise you --
7              MR. WILLEY:  I hope that the Court --
8              THE COURT:  -- Mr. Willey, that I have a very open
9     mind as to what the contract is.
10             MR. WILLEY:  Right.
11             THE COURT:  I don't even know who your client is it
12    turns out because I'm -- I'm telling you.  The -- is it an LLC?
13    Why isn't there anything about the LLC in any of the -- the
14    correspondence that I've seen?  Is it the individuals?  Is it a
15    partnership?  There are so many issues --
16             MR. WILLEY:  Your Honor?
17             THE COURT:  -- that get to be dealt with so I'm --
18             MR. WILLEY:  The --
19             THE COURT:  -- looking forward to it in a couple
20    months.
21             MR. WILLEY:  If I could just say; if you could just
22    hold plaintiff to their own amended complaint with regard to
23    the terms.  They state the proposed contract in its entirety
24    stated and then they list the text that is, again, in the
25    e-mail under the terms of our arrangement.  And that's even
```

1   plaintiff's own statement.
2         And if you look at why this contractual -- this business
3   relationship over selling posters was haphazardly constructed,
4   it was plaintiff's own choice.  They had no interest in
5   operating this business in Spring of 2013.  They had no
6   interest in operating it once they got it back.
7         The fact that we're here now trying to interpret their
8   e-mails, they didn't even want to hire an attorney to draft a
9   contract.  And I feel like we're in the same place that we were
10  a year ago.  And I've heard the settlement talk many times and
11  I headed your Honor's advice and put together an early Rule 68
12  offer judgment.
13              THE COURT:  I'm -- I don't want to hear about it.
14              MR. DORSI:  Can I ask that Mr. Willey not break
15  settlement privilege?
16              MR. WILLEY:  I stated that I made an offer of
17  judgment.  I don't feel that that's --
18              THE COURT:  I'm looking forward to seeing you at the
19  pretrial conference and I'll try and get an order out as soon
20  as I can.  Thanks, very much.
21              MR. DORSI:  Thank you, your Honor.
22              MR. CHATTERJEE:  Thank you, your Honor.
23                  (Proceedings concluded at 3:04 p.m.)
24
25

1

### CERTIFICATE OF REPORTER

I certify that the foregoing is a true and correct transcript, to the best of my ability, of the pages of the official electronic sound recording provided to me by the U.S. District Court, Northern District of California, of the proceedings taken on the date and time previously stated in the above matter.

I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken; and, further, that I am not financially nor otherwise interested in the outcome of the action.



_____DATE 1-31-15

      Carrie McKee-Parks          Date
     McKee-Parks65@att.net
        510-637-9897